UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA f/u/o JEMS FABRICATION, INC. | CIVIL ACTION |
| VERSUS | CASE NO. 12-0393 |
| BENETECH, LLC, FIDELITY AND DEPOSIT COMPANY OF MARYLAND, and ZURICH AMERICAN INSURANCE COMPANY | SECTION: G (3) |

REASONS FOR JUDGMENT

This matter came before this Court for trial without a jury on June 17, 2013 through June 18, 2013.  The Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1352, which provides for original jurisdiction over an action on a bond executed under the law of the United States, including a payment bond executed under the Miller Act, 40 U.S.C. § 3131, *et seq.* The Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over Plaintiff JEMS Fabrication, Inc.'s ("JEMS") state law claims.   Venue is proper in this Court, pursuant to 40 U.S.C. § 3131(b)(3), as the work performed under the contracts at issue occurred within this judicial district, and, pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to JEMS' claims occurred in this judicial district.  The substantive law applicable to the claim on the payment bond executed under the Miller Act is federal law, and Louisiana law applies to JEMS' state law claims against Benetech, L.L.C. ("Benetech").

The Court has carefully considered the testimony of all of the witnesses and the exhibits entered into evidence during the trial, as well as the record.  After reviewing all of the evidence and post-trial briefs and pursuant to Federal Rule of Civil Procedure Rule 52(a), the Court issues the following findings of fact and conclusions of law.  To the extent that any finding of fact may

1

be construed as a conclusion of law, the Court hereby adopts it as such and to the extent that any

conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

## I. Background

The United States Army Corps of Engineers (the "Corps") contracted with Benetech to

renovate and/or redevelop pumping stations at various sites located on the West Bank of the

Mississippi River in Louisiana (hereinafter, the "JSP-05 Project" or "Project").   On December

29, 2009, the surety defendants, Fidelity and Deposit Company of Maryland and Zurich

American Insurance Company (collectively, the "Sureties"), issued a Miller Act payment bond

on behalf of Benetech to protect subcontractors on the JSP-05 Project against the risk of non-

payment by Benetech.   Effective January 6, 2010, Benetech entered into a subcontract (the

"Contract") with JEMS to provide certain custom-fabricated structural steel for the JSP-05

Project in exchange for payment of $2,350,000.00.   The Contract included $202,432.00 for

drawings, $1,316,584.00 for materials, and $830,984.00 for labor on the Project. [1]

In July 2010, Benetech informed JEMS that Benetech was not in compliance with certain

requirements of the Corps as to the amount of labor Benetech provided directly on the JSP-05

Project.  For this reason, Benetech asked JEMS to agree to permit Benetech to provide the on-

site labor on the Contract going forward.  JEMS agreed to the change in scope of the Contract,

and although the parties did not memorialize this modification in writing, JEMS terminated its

labor force working in New Orleans effective on July 26, 2010.   Subsequently, Benetech

---

[1] Pretrial Order, Rec. Doc. 60 at pp. 3-4; *see also* Pl.'s Ex. 356.

provided the on-site labor in New Orleans for installation-aspects of the JSP-05 Project, while JEMS continued to incur labor costs relating to the fabrication of materials under the Contract.[2]

On November 23, 2010, Benetech and JEMS approved a change order in the amount of $29,739.60. The change order increased the total contract amount to $2,379,739.60 (the "Contract Price").[3] The change order was for the "modification at suction basin strut foundation associated with redesigned pile cap," and therefore, the increase in the Contract Price was attributable to the additional materials required by the change order.[4]

The parties stipulated that JEMS provided all of the drawings required by the Contract. The parties also agree that JEMS did not deliver the materials required by the Contract to construct the Hero Building (a specific item in the agreement), because the parties agreed that Benetech would purchase the building directly from a subcontractor. James Book, Benetech's Director of Construction, authorized periodic payments to JEMS during the course of the Contract, and Benetech ultimately paid JEMS $996,882.14 for its work on the JSP-05 Project.[5]

The parties have not disputed these events, nor did the testimony at trial raise any doubt regarding these facts. Rather, the parties dispute whether Benetech owes additional amounts to JEMS under the Contract. First, the parties dispute whether the modification of the labor component of the Contract canceled the labor portion entirely or whether JEMS is entitled to payment for labor relating to the fabrication of the various steel components off-site. Second, the parties dispute whether JEMS provided all materials required by the Contract, with the exception of the Hero building. Benetech disputes the sufficiency of JEMS's evidence as to

---

[2] Pretrial Order, Rec. Doc. 60 at p. 4.

[3] *Id.* at pp. 3-4; *see also* Pl.'s Ex. 357.

[4] *See* Pl.'s Ex. 366.

[5] Pretrial Order, Rec. Doc. 60 at p. 4.

establish that the materials were delivered, and contends that it spent no less than $400,000 to complete JEMS's scope of work.  JEMS, in turn, contends that Benetech has insufficient proof to establish (1) that the expenses incurred by Benetech were within the scope of JEMS' work, (2) that Benetech provided JEMS with sufficient notice of such alleged non-performance, and (3) that any particular expense Benetech claims, is supported by sufficient evidence.  Even if Benetech established the foregoing points regarding its alleged expenditures, JEMS contends that such expenditures do not establish that JEMS did not perform its obligations under the Contract that would prohibit it from recovering the remaining sums it is owed under the Contract.[6] Finally, the Sureties contend that they are not liable to JEMS on the payment bond, because JEMS' claims had prescribed, JEMS did provide adequate proof of the materials delivered under the Contract, and shop drawings, an item covered by the Contract, are not compensable under the Miller Act.

## II.  Findings of Fact and Conclusions of Law

### A.  *Plaintiff's Claim against Benetech for Breach of Contract*

The Sureties and Benetech (collectively, "Defendants") argue that JEMS failed to establish that it completely performed under the Contract between JEMS and Benetech, and therefore, JEMS is not entitled to recover the difference between the Contract Price and the sum of $996,882.14 that Benetech already paid.  The Sureties contend that JEMS' recovery, if any, is in *quantum meruit*.[7]  In contrast, JEMS argues that "[a]ll evidence presented at trial pointed to extensive performance by JEMS[,]" and the testimony of JEMS' President Andrew Stager and

---

[6] Pretrial Order, Rec. Doc. 60 at pp. 4-5.

[7] Sureties Post-Trial Br., Rec. Doc. 66 at pp. 13-17.

JEMS' Chief Financial Officer Brian Riffle, established that "Benetech employees were highly complimentary of JEMS' work as late as January 2011" and even discussed the possibility of JEMS' participation in other projects.

The evidence presented at trial established that, on January 6, 2010, Benetech and JEMS entered into a subcontract for JEMS to provide certain custom-fabricated structural steel for the JSP-05 Project in exchange for payment of $2,379,739.60.[8]   The Schedule of Values in the Contract and the testimony at trial establishes that the Contract divided the work into three categories: (1) $202,432.00 for drawings; (2) $1,316,584.00 for materials; and (3) $830,984.00 for labor.   For satisfactory performance of all work under the Contract, Benetech agreed to pay the "all-inclusive lump-sum" Contract Price.[9]   However, the testimony at trial established that the parties agreed upon a number of modifications to the original contract terms.

*1. Drawings*

Regarding the first category of work required by the Contract, the parties stipulated that JEMS delivered all drawings required under the Contract.   The testimony of James Williams, JEMS' project coordinator, established that these drawings were for specialized structural steel components, and the drawings provided the specific dimensions of each part and information to

---

[8] The contract price was originally $2,350,000.00, but, on November 23, 2010, Benetech and JEMS approved a change order in the amount of $29,739.60, which increased the contract price to $2,379,739.60.  *See* Change Order, Pl.'s Ex. 357.

[9] Contract, Pl.'s Ex. 356, attach. B,  para. 1.0; *see also* Trial Tr. (Stager), p. 101, ll. 22-25 (Rec. Doc. 67-1 at p. 18).

install the components.[10]  Mr. Stager testified that the drawings were delivered to Benetech and used at the job site.[11]

### 2. Materials

The second category of work under the Contract—the fabrication and delivery of materials—was modified in the method of documentation required for payment and the scope of materials JEMS was required to furnish.  Initially, the terms of the contract required JEMS to provide invoices for payment, which Benetech was obligated to pay within five days after receipt of funds by client.[12]  However, extensive testimony established that interim invoices were not a prerequisite to payment under the Contract.  Indeed, Benetech submitted a number of payments to JEMS without requesting any invoices, and only appears to have raised deficiencies in JEMS' performance and the lack of invoices after Benetech admittedly ran into cash flow problems. Benetech's payments never included any explanation or detail of which materials for which were being paid.  Rather, the evidence established that the parties understood that JEMS would be paid the difference between the Contract Price and Benetech's prior payments when the Project was complete, because the Contract was a lump-sum contract.[13]

Although the parties spent substantial time contesting the number and sufficiency of the shipping tickets, the Court finds that these shipping tickets are not relevant for purposes of determining the amounts owed to JEMS, but rather are indicative of JEMS performance under

---

[10] Trial Tr. (Williams), p. 123, ll. 11-15 (Rec. Doc. 67-1 at p. 22).

[11] Trial Tr. (Stager), pp. 57-58, p. 106, ll. 13-15 (Rec. Doc. 67-1 at pp. 9-10, 19).

[12] Contract, Pl.'s Ex. 356, attach. B, paras. 4.0-5.0.

[13] *See* Trial Tr. (Book), pp. 354-55 (Rec. Doc. 67-1 at pp. 66-67); *see also* Trial Tr. (Stager), p. 101, ll. 22-25 (Rec. Doc. 67-1 at p. 18).

the Contract.  The shipping tickets themselves did not include any price for the materials being delivered.  However, the shipping tickets sent by JEMS in advance of shipments provided a mechanism for Benetech to track what was provided and notify JEMS if materials believed to be shipped were absent or incorrect when delivered to the jobsite.[14]  If Benetech was receiving shipping tickets for materials it never received the only reasonable inference is that Benetech would have notified JEMS.  There is no evidence before the Court that JEMS' shipments did not arrive; in fact, the fact that the steel work on the JSP-05 Project is complete is evidence that the fabricated materials were received.[15]

The only evidence submitted at trial of problems with the materials fabricated by JEMS was the testimony of the steel superintended, Mitch McDonald.  Mr. McDonald could only identify some fuel containment stairs and miscellaneous components of the missile barrier fencing that JEMS failed to deliver.[16]  Taken together, the shipping tickets, bills of lading, and other documents admitted into evidence at trial support JEMS' contention that it performed under the Contract regarding the fabrication and delivery of materials.[17]  Considering the practices adopted by the parties and lump-sum nature of the Contract, the Court finds that, absent evidence notifying JEMS that materials were missing or inaccurate, JEMS delivered the material required by the Contract, and is therefore entitled to amounts owed for the materials portion of the Contract.[18]

---

[14]  Trial Tr. (Stager), p. 65, ll. 3-9 (Rec. Doc. 67-1 at p. 12).

[15] Trial Tr. (Book), p. 363, ll. 6-7 (Rec. Doc. 67-1 at p. 70).

[16] Trial Tr. (MacDonald), p. 313, ll. 11-21, p. 317, ll. 22-25, p. 318, ll. 1-2 (Rec. Doc. 67-1 at pp. 58-60).

[17] *See, e.g.*, Trial Tr. (Stager), p. 61 (Rec. Doc. 67-1 at p. 11); Trial Tr. (Williams), pp. 173-74 (Rec. Doc. 67-1 at pp. 33-34).

[18] *See* Pl.'s Post-Trial Br., Rec. Doc. 63 at pp. 4-5 & nn. 9-20.

However, the parties agreed to modify the materials included under the Contract to exclude JEMS obligation to provide the Hero building.  Instead, Benetech purchased the Hero building directly from the subcontractor,[19] because Benetech was behind on its payments to JEMS, and JEMS refused to deliver without payment.[20]  According to the testimony of James Kiser, JEMS' office manager, JEMS entered into a purchase agreement with Corle to purchase the Hero building for $54,000.00 and made a $8,100.00 deposit on the building.[21]  JEMS had approved drawings from Benetech for the fabrication of the building, and it instructed Corle to fabricate the building to those dimensions.[22]  The building was fully fabricated by Corle and awaiting shipment when Benetech refused to remit payment to JEMS.  Benetech purchased the building directly from Corle and claims to have spent $147,000.00 on the Hero building, because the Corps subsequently changed the building specifications requiring the purchase of additional materials. However, Benetech did not provide advance notice to JEMS before purchasing additional components for this building, which it now intends to deduct from the sums owed to JEMS.[23]  Further, to the extent that the Corps changed the building specifications after JEMS' drawings for the building were approved, the expenses do not fall within the scope of JEMS' work.[24]  Accordingly, Benetech may only deduct from the Contract Price the sum of $54,000.00 originally contemplated for the construction of the Hero building when the parties negotiated the

---

[19] Pretrial Order, Rec. Doc. 60 at p. 5.

[20] Trial Tr. (Stager), p. 107, ll. 13-17 (Rec. Doc. 67-1 at p. 20).

[21] Corle purchase agreement, Pl.'s Ex. 363; Trial Tr. (Kiser), p. 233, ll.13-19 (Rec. Doc. 67-1 at p. 46); Trial Tr. (Stager), p. 107, ll. 7-17 (Rec. Doc. 67-1 at p. 20).

[22] Trial Tr. (Kiser), p. 229, ll. 19-24 (Rec. Doc. 67-1 at p. 45).

[23] Benetech's Ex. 5 at p. 5; Pl.'s Ex. 410; Trial Tr. (Kiser), p. 226, p. 246, ll. 3-5 (Rec. Doc. 67-1 at pp. 44, 49).

[24] Trial Tr. (Book), p. 357, ll. 1-20, p. 369, ll. 15-21 (Rec. Doc. 67-1 at pp. 69, 73).

modification, because there is no evidence before the Court that Benetech gave any notice to JEMS of the increased cost.

Benetech also argued that it self-performed much of the Contract, and therefore, the materials Benetech was required to purchase elsewhere should be deducted from any sums owed under the Contract to JEMS.[25]  In response, JEMS argues that Benetech was required to give JEMS notice and forty-eight hours to cure any deficiencies in JEMS' performance prior to incurring these additional expenses.[26]  The testimony of Mr. Stager indicated that Benetech did not put JEMS on notice that its performance was deficient in any way, nor did Benetech advise JEMS at any time prior to March 2011 that Benetech intended to purchase and charge JEMS for materials within the scope of JEMS' work.[27]  On March 23, 2011, JEMS put Benetech on notice that Benetech could not purchase materials on the Contract without giving JEMS prior notice and an opportunity to cure under Paragraphs 33.0 and 39.0 of the Contract.[28]  Moreover, despite JEMS' inquiries, Benetech refused to identify the items it intended to deduct from JEMS' payments until after litigation commenced.[29]  Finally, even at trial, Benetech did not produce any evidence tying the purchases it claims it was required to make due to JEMS' alleged deficiencies in performance with materials that JEMS was required to fabricate and deliver under the Contract.[30]  Because Benetech failed to provide JEMS with notice of any deficiency and an opportunity to cure before incurring the additional expenses, Benetech is not entitled to deduct

---

[25] Benetech's Ex. 19 (purportedly reflecting Benetech's expenditures for work JEMS did not perform).

[26] Contract, Pl.'s Ex. 356, attach. B, para. 33.0.

[27] Trial Tr. (Stager), p. 70, ll. 21-25 (Rec. Doc. 67-1 at p. 70); *see also* Trial Tr. (Book), p. 376, ll. 14-21 (Rec. Doc. 67-1 at p. 74).

[28] Rec. Doc. 63 at p. 7 (citing Pl.'s Ex. 384); Trial Tr. (Book), p. 376, ll. 14-21 (Rec. Doc. 67-1 at p. 74); *see also* Trial Tr. (Stager), pp. 54-55 (Rec. Doc. 67-1 at pp. 7-8).

[29] Trial Tr. (Stager), p. 70, ll. 21-25, p. 73, ll. 1-3 (Rec. Doc. 67-1 at pp. 14, 17); Pl.'s Ex. 385.

[30] Trial Tr. (Book), p. 379, ll. 21-25, p. 380, ll. 1-3 (Rec. Doc. 67-1 at pp. 75-76).

these expenditures, in excess of the $54,000 attributable to the Hero building, from what Benetech otherwise owes JEMS pursuant to the Contract.

### 3. Labor

The parties also modified the labor that JEMS was required to provide under the Contract, but they never reduced this modification to writing.  JEMS contends that the Contract was modified to eliminate on-site labor only and JEMS is still owed the costs of fabrication labor.[31]  In JEMS' estimation, it incurred $148,508.75 in fabrication labor and its subcontractor, Compton Steel, incurred an additional $148,508.75 in fabrication labor,[32] which Compton Steel billed to JEMS.[33]  In support of this estimation, JEMS entered into evidence a bid rate of $65/hour for labor in the Contract and payroll records evidencing 2,284.75 hours of in-shop labor on the Contract.[34]

Defendants argue that the parties' agreement to modify the labor JEMS was required to provide under the Contract to meet Corps' requirements for Benetech to be considered a disadvantaged business resulted in the cancellation of the entire labor portion of the Contract, and therefore the Contract Price was reduced by $830,984.00.[35]  Further, Defendants contend that the numbers JEMS based its fabrication labor estimates on reflected extensive amounts of

---

[31] Trial Tr. (Stager), p. 43, ll. 18-19 (Rec. Doc. 67-1 at p. 4).

[32] Trial Tr. (Riffle), p. 282, ll. 6-9 (Rec. Doc. 67-1 at p. 55).

[33] Trial Tr. (Williams), p. 177, ll. 2-3 (Rec. Doc. 67-1 at p. 35).

[34] Trial Tr. (Riffle), p. 278, ll. 6-10 (Rec. Doc. 67-1 at p. 53); Pl.'s Ex. 390.

[35] Rec. Doc. 64-3 at p. 10 (citing Pl.'s Ex. 356, p. 24).

time for labor unrelated to the JSP-05 Project and failed to distinguish between amounts paid in taxes, employee benefits, or wages and profit.[36]

The Court finds that JEMS has not presented sufficient evidence to establish that when the parties' agreed to have Benetech provide the on-site labor, they contemplated that JEMS would be entitled to payment of $311,000.00 in fabrication labor.  The Contract clearly delineated the sum attributable to labor and the testimony at trial indicated that the parties agreed to cancel this portion of the Contract.[37]  No evidence presented to the Court suggests that the parties' common intent was to allow JEMS to recover the costs of off-site "fabrication" labor.  If the parties had anticipated such labor to be compensated separately from the materials portion of the Contract, they would have discussed such compensation.  Further, the evidence at trial indicated that the price of steel was far less than the price JEMS was to be paid under the materials portion of the Contract; however, the price of fabricated steel correlated with the Contract Price.[38]  Therefore, the Court finds that the amount attributable to the materials portion of the Contract incorporated the cost of fabrication labor, and JEMS is not entitled to recover an additional amount for off-site labor.

### 4.  Recovery under the Contract

In an action for breach of contract, the burden of proof is on the party claiming rights under the contract to establish by a preponderance of the evidence the elements essential to

---

[36] *See* Pl.'s Ex. 390; Trial Tr. (Riffle), p. 291, p. 297,13-23, p. 299, p. 300 (Rec. Doc. 68-1 at pp. 16, 18-20).

[37] Trial Tr. (Book), pp. 323-324 (Rec. Doc. 68-1 at pp. 23-24); Trial Tr. (Stager), p. 41-42 (Rec. Doc. 68-1 at pp. 1-2).

[38] Trial Tr. (Kiser), p. 221, ll. 11-16 (Rec. Doc. 68-1 at p. 10).

recovery.[39]  "The existence of the contract and its terms must be proved by a preponderance of the evidence."[40]   In interpreting contracts, courts are guided by the general rules contained in articles 2545 to 2057 of the Louisiana Civil Code, and the interpretation of a contract is the determination of the common intent of the parties.[41]   "The essential elements of a breach of contract claim are (1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee."[42]  Here, Benetech undertook an obligation to pay JEMS the Contract Price upon JEMS satisfactory performance of its obligation to fabricate and deliver the steel and drawings required by the Contract.

As discussed in detail above, the evidence presented at trial established that JEMS satisfactorily performed under the Contract, and therefore Benetech is obligated to pay JEMS amounts owed on the Contract.   Indeed, JEMS performance under the Contract was not questioned until March 2011.  At that time, the evidence indicated that Benetech may have had other motivations for refusing to pay JEMS.  After Benetech's teaming partner walked off the job over payment issues, Benetech was unable to keep up with its obligations to the Corps or its subcontractors.[43]  By January 2011, Benetech was having cash flow problems and difficulty paying venders.[44]  But at the same time, Benetech and James Book, Benetech's Director of

---

[39] *Fleet Intermodal Servs., LLC v. St. Bernard Post, Harbor & Terminal Dist.*, 2010-1485 (La. App. 4 Cir. 2/23/11), 60 So. 3d 85, 88; *Adams v. Commercial Nat. Bank in Shreveport*, 27,360 (La. App. 2 Cir. 9/27/95); 661 So. 2d 636, 639.

[40] *Fleet Intermodal Servs., LLC*, 60 So. 3d at 88.

[41] *Id.* at 88-89.

[42] *Favrot v. Favrot*, 2010-0986 (La. App. 4 Cir. 2/9/11), 68 So. 3d 1099, 1108-09.

[43] Trial Tr. (Book), pp. 355-56 (Rec. Doc. 67-1 at pp. 67-68).

[44] Trial Tr. (Stager), p. 112, ll. 20-23 (Rec. Doc. 67-1 at p. 21); Trial Tr. (Riffle), p. 265, ll. 2-11 (Rec. Doc. 67-1 at p. 52).

Construction, were complimenting JEMS' performance.[45]   Therefore, based upon the evidence presented by JEMS and the circumstances under which Benetech now argues JEMS' performance was unsatisfactory, the Court finds that Benetech is liable to JEMS for the remainder of the Contract price, less labor and the cost of the Hero building.  Because Benetech paid JEMS $996,882.14, the outstanding difference between the amount paid and the Contract Price is $1,382,857.46.   However, the amount of $54,000.00 for the Corle building and the labor portion of the Contract in the amount of $830,984.00 must be deducted from the Contract Price. Therefore, JEMS is entitled to recover $497,873.46 on the Contract.

### B.  Plaintiff's Claim against the Sureties under the Miller Act

#### 1.  Preemption

Prior to trial, the Sureties moved for summary judgment contending that JEMS' claim under the Miller Act had prescribed, because 40 U.S.C § 3133(b)(4) requires an action to "be brought within one year of the last work done by the claimant."[46]   This Court denied the Sureties' motion for summary judgment, finding that "JEMS has carried its burden to demonstrate the existence of genuine issues of material fact that deliveries of steel in April of 2011 were furnished under the subcontract," and therefore tolled the one-year limitation period.[47] This issue was raised again at trial, where the Sureties argued that the Miller Act claim, filed in February 2012, was time-barred because the Contract was substantially complete with 75% of the construction done by November 2010.  JEMS asserted at trial that its Miller Act claim was

---

[45] Trial Tr. (Stager), p. 112, ll. 10-2 (Rec. Doc. 67-1 at p. 21); Trial Tr. (Riffle), p. 264, ll. 5-14 (Rec. Doc. 67-1 at p. 51).

[46] Mot. for Summ. J., Rec. Doc. 16-1 at p. 3.

[47] Order & Reasons, Rec. Doc. 30 at p. 13.

timely under the express language of 40 U.S.C. § 3133(b)(4), because JEMS supplied its last shipments of steel to Benetech pursuant to the Contract in April 2011, placing the filing of the action in February 2012 within the one-year limitations period.

The Miller Act, which applies to contracts awarded for construction of public buildings or public works of the federal government, allows subcontractors who have not been paid to bring a civil action on the payment bond for the amount unpaid at the time the suit is brought.[48] The Miller Act authorizes an action on the payment bond when the prime contractor fails to pay for labor or materials within 90 days.[49] The Miller Act is "highly remedial in nature" and should always be given a liberal construction in favor of allowing recovery.[50] The limitations period at issue in this case, pursuant to 40 U.S.C. § 3133(b)(4), provides that "[a]n action brought under this subsection must be brought no later than one year after the day on which the last of the labor was performed or material was supplied by the person bringing the action."

In cases, such as this one, involving the supply of materials, the Fifth Circuit has distinguished between materials furnished for repairs, which will not toll the limitations period, and materials furnished as part of the original contract, which will toll the one-year limitations period.[51] In *Johnson Service Co. v. Transamerica Insurance Co.*,[52] the Fifth Circuit looked to the Miller Act decisions as "strong persuasive authority" in a case where the bond at issue was

---

[48] 40 U.S.C. § 3133(b).

[49] *See id.*

[50] *J.D. Fields & Co. v. Gottfried Corp.*, 272 F.3d 692, 696 (5th Cir. 2001); *accord MacEvoy v. Calvin Tomkins Co.*, 332 U.S. 102, 107 (1944); *Gold Bond Bldg. Prods. v. Blake Constr. Co.*, 820 F.2d 139, 142 (5th Cir. 1987); *Trinity Universal Ins. Co. v. Girdner*, 379 F.2d 317, 318 (5th Cir. 1967) (per curiam).

[51] *See Ga. Elec. Supply Co. v. U.S. Fid. & Guar. Co.*, 656 F.2d 993, 996 (5th Cir. Unit B Sept. 1981).

[52] 485 F.2d 164 (5th Cir. 1973).

executed on a form prescribed by the Miller Act.[53]  The Fifth Circuit held that "each case must be judged on its own facts," but noted the "general rule that 'repairs' are not sufficient to toll the notice period."[54]  Thereafter, in *Georgia Electric Supply Co. v. United States Fidelity & Guaranty Co.*,[55] the Fifth Circuit reiterated the distinction drawn in *Johnson Service Co.*, stating that "[t]he line drawn by this Court . . ., whether the materials were furnished for repairs or as part of the original contract is admittedly hazy."[56]  Therefore, the Fifth Circuit offered the following factors to consider in cases where the distinction between materials furnished for repairs or as part of the original contract is "hazy": (1) the value of the materials; (2) the original contract specifications; (3) the unexpected nature of the work; and (4) the importance of the materials to the operation of the system in which they are used.[57]  If these factual inquiries lead to the conclusion that the materials were furnished as part of the original contract, then the one-year limitation period does not begin to run until the delivery of those materials.[58]

The evidence at trial established that in the fall of 2010, 25% of the work on the JSP-05 project was incomplete.  Essential steel components, including the missile barriers, were delivered by JEMS in April 2011.  These items were required by the Contract, essential to the operation of the system, and anticipated by Benetech based on the terms of the Contract and its subsequent instructions to fabricate the components.  Therefore, regardless of whether the factors set forth by the Fifth Circuit in *Georgia Elector* or the "substantial completion" test advocated by

---

[53] *Id.* at 173.

[54] *Id.*

[55] 656 F.2d 993.

[56] *Id.* at 996.

[57] *Id.*

[58] *See id.* (citing *Johnson Serv. Co.*, 485 F.2d at 174).

the Sureties is applied, the Court finds that the work was not substantially complete in November of 2010 and JEMS' subsequent deliveries in April 2011 were furnished as part of the original Contract.  Accordingly, JEMS Miller Act claim was timely filed in February 2012.

### 2. *Recovery Under Miller Act for Material Furnished*

The Sureties' liability is governed by the terms of their bond with Benetech[59] and federal law.[60]  While Benetech remains directly liable for its own breach of contract, the bond in this case imposes liability on the Sureties for the breach if JEMS establishes a claim under the Miller Act.[61]  To establish a claim under the Miller Act:

> it is necessary only that [Plaintiff] show that the materials were supplied in prosecution of the work provided for in the contract, that [it] has not been paid therefor, that in good faith [it] had reason to believe the materials were intended for the specified work, and that [it] complied with the jurisdictional requisites.[62]

Further, the Miller Act must be liberally construed to "effectuate the Congressional intent to protect those who furnish labor or materials for public works."[63]

Here, the Sureties argue that there is insufficient evidence to establish that JEMS supplied the materials for which it seeks payment.[64]  However, the Court finds that JEMS presented sufficient evidence to establish that it performed under the Contract and is therefore entitled to recover the remaining balance owed on the Contract Price, less labor and the cost of the Hero building.  The Sureties maintain that JEMS is required to provide invoices correlating with the

---

[59] *See L & A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106, 109 (5th Cir. 1994).

[60] *See F.D. Rich Co., Inc. v. Indust. Lumber Co., Inc.*, 417 U.S. 116, 127 (1974).

[61] *See id.*

[62] *U. S. ex rel. Carlson v. Cont'l Cas. Co.*, 414 F.2d 431, 433 (5th Cir. 1969); *see also U.S. ex rel. Canion v. Randall & Blake*, 817 F.2d 1188, 1191 (5th Cir. 1987).

[63] *J.D. Fields*, 272 F.3d at 696.

[64] Rec. Doc. 66 at p. 16.

materials delivered; however, the facts presented at trial demonstrated that the parties agreed interim invoices were not a prerequisite to payment under the Contract.  Further, the Sureties have cited no authority for this proposition.  Rather, the Sureties cite a Fifth Circuit decision explaining the difference between a breach and a legal default, the latter being "a [] material breach or series of material breaches [] of such magnitude that the obligee is justified in terminating the contract."[65]  Here, Benetech's nonpayment of the balance of the Contract Price is a material breach of such magnitude that it constitutes a legal default which the Surety is obligated to step in and remedy.  The fact that the parties did not rely on invoices in the course of their dealings under the Contract does not absolve the Sureties from liability on the payment bond and, as noted above, the Sureties could point to no authority to support any other conclusion.

### 3. Recovery under the Miller Act for Drawings

By stipulation, the parties agreed that JEMS delivered all drawings required by the Contract,[66] but the Sureties contend that the drawings are not compensable under the Miller Act.[67]  The Sureties rely on a case from the Eastern District of Virginia to support their proposition that "[t]he preparation of drawings and other work performed off-site is not labor, supervision, or inspection at the site and nothing in the bond requires the sureties to pay for

---

[65] *L&A Contracting Co.*, 17 F.3d at 110.

[66] Rec. Doc. 63 at p. 13.

[67] Although the Court addresses the Sureties' argument here, Benetech already paid for the drawings, as discussed in greater detail below, because Benetech's payments of $996,882.14 covered the amount JEMS was owed for the drawings.

drawings."[68]   However, the Court finds the decision in *United States ex rel. Constructors, Inc. v. Gulf Insurance Co.* inapposite here, because the Virginia district court was deciding whether clerical or administrative services constituted "labor" falling within the scope of the Miller Act.[69] Such clerical and administrative services are distinguishable from the shop drawings at issue here.

JEMS' office manager, Mr. Williams, testified that the drawings JEMS prepared were detailed drawings for specialized structural steel components.[70]   Each of the drawings provided dimensions for the fabrication of the steel components and information to install these items. Mr. Stager testified that without the drawings the steel could not have been fabricated or installed at the job-site.   He further testified that the drawings were delivered to Benetech and used at the jobsite for installation.[71]

In *Glassell-Taylor Co. v. Magnolia Petroleum Co.*,[72] the Fifth Circuit explained that bonds issued pursuant to acts of Congress that speak of "persons supplying labor and materials in the prosecution of the work[,]" such as the Miller Act, must be liberally construed, and courts have permitted recovery for various types of materials and labor furnished under these bonds, including "drawings [and] patterns[] used by [a] contractor in making molds for the castings entering into the construction of [a] ship."[73]   Furthermore, this Court find persuasive a decision by the United States Court of Appeals for the Third Circuit in *United States ex rel. E& H Steel*

---

[68] Sureties' Trial. Mem., Rec. Doc. 53 at p. 4 (citing *U.S. ex rel. Constructors, Inc. v. Gulf Ins. Co.*, 313 F. Supp. 2d 593, 597 (E.D. Va. 2004)).

[69] 313 F. Supp. 2d at 597.

[70] Trial Tr. (Williams), p. 123, ll. 11-15 (Rec. Doc. 67-1 at p. 22).

[71] Trial Tr. (Stager), pp. 57-58, p. 106, ll. 13-15 (Rec. Doc. 67-1 at pp. 9-10, 19).

[72] 153 F.2d 527 (5th Cir. 1946).

[73] *Id.* at 530.

*Corp. v. C. Pyramid Enterprises, Inc.*,[74] wherein the circuit court held that a supplier of fabricated materials that "prepared shop drawings and erection drawings, designed the connectors, and performed some 'design-assist engineering'" was a "subcontractor" within the meaning of the Miller Act.[75]   Although the Third Circuit was considering whether an entity qualified as a "subcontractor" under the Miller Act, the court's reasoning nonetheless suggests that activities such as preparing shop drawings constitute the type of work performed by a "subcontractor" under the Miller Act.   Therefore, the Court finds that the specialized shop drawings at issue here, which were necessary for fabrication and installation of the steel and were used at the jobsite, are compensable under the Miller Act.

Moreover, even if the drawings were not compensable under the Miller Act, the Sureties provide no justification as to why the amount due for the drawings should be deducted from the top of the remainder of the Contract Price owed to JEMS, rather than attributed to the amounts already paid by Benetech.   Therefore, the Court will not deduct the drawings from the balance of the Contract Price owed to JEMS.

### III.  Conclusion

For the foregoing reasons, this Court finds that JEMS has sustained its burden to prove that it delivered the materials and drawings required by the Contract, and Benetech is liable to JEMS for the balance of the Contract Price, less labor and the cost of the Hero building. Therefore, JEMS is entitled to recover $497,873.46 on the Contract, that is, the Contract Price ($2,379,739.60), less the payments already made ($996,882.14), less the labor portion of the

---

[74] 509 F.3d 184 (3d Cir. 2007).

[75] *Id.* at 189.

contract ($830,984.00), and less the anticipated cost of the Hero building ($54,000.00).  Further, JEMS' claim was timely filed and the amounts owed are for items covered under the Miller Act, and so the Sureties cannot except responsibility here.  JEMS, pursuant to the Miller Act, 40 U.S.C. § 3131(b)(1), is entitled to judgment against Benetech and the Sureties for the amounts owed on the Contract, plus legal interest.   Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that there be judgment in favor of JEMS and against Benetech and the Sureties in the amount of $497,873.46, plus legal interest thereon.

**NEW ORLEANS, LOUISIANA**, this __1st__ day of August, 2013.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

20